IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JOSHUA STOCKTON                                                    PLAINTIFF

V.                         Case No. 4:23-CV-00944-JM-BBM

CONNIE JENKINS, Classification Officer,
Ester Complex, ADC                                                 DEFENDANT

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge James M. Moody Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Moody may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I.     INTRODUCTION

On October 5, 2023, Plaintiff Joshua Stockton ("Stockton"), then a prisoner in the Arkansas Division of Corrections ("ADC"), filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights. (Doc. 2). After the Court screened Stockton's Complaint and granted Defendants' Motion for Partial Summary Judgment on the issue of exhaustion, Stockton is left proceeding on a claim that Defendant Connie Jenkins ("Jenkins") assigned Stockton to a job as a barracks porter in violation of

his medical restrictions. (Doc. 9); (Doc. 48). Stockton sues Jenkins in her individual capacity only. (Doc. 9).

On March 28, 2025, Jenkins filed a Motion for Summary Judgment, (Doc. 80-10), a Brief in Support, (Doc. 82), and a Statement of Undisputed Material Facts, (Doc. 81), arguing that Stockton's claims fail on the merits. Stockton filed a Response to the Motion for Summary Judgment, (Doc. 89), and two Responses to the Statement of Undisputed Material Facts, (Doc. 87); (Doc. 88). For the following reasons, it is recommended that Jenkins's Motion for Summary Judgment be granted.[1]

## II.    BACKGROUND

Stockton has a history of leg and back pain, attributed to motorcycle accidents and degenerative disc disease. (Doc. 80-7 at 13–15, 18–20). He sought treatment while incarcerated at the ADC's Pine Bluff Unit.[2] On July 5, 2023, after Stockton complained that his back kept "going out" and requested work restrictions, a non-party ARPN, LaKita Davis ("APRN Davis"), found that Stockton had palpable tenderness in his lower back and

---

[1] Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." *Brand v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799, 802 (8th Cir. 2019) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015)). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).

[2] The Pine Bluff Unit is also known as the Randall L. Williams Correctional Facility, *see* (Doc. 80-1 at 20:1–5), and is sometimes cited such in the record, *see e.g.*, (Doc. 80-7 at 16–17, 128).

a "positive straight-leg raising test bilaterally."[3] (Doc. 80-7 at 15). She provided Stockton

the following restrictions:

> Avoid Prolonged Crawling, etc.      UNTIL: 07/04/2024
>
> Restrict from assignment requiring prolonged crawling, stopping, running, jumping, walking or standing, in excess of 0 hours per day. Allow 10 minute break after each hour.
>
> _____
>
> Avoid Strenuous Physical Act[ivit]y      UNTIL: 07/04/2024
>
> Restrict from assignment requiring strenuous physical activity in excess of 0 hours per day. Allow 10 minute break after each hour.
>
> _____
>
> Avoid Heavy Lifting      UNTIL: 07/04/2024
>
> Restrict from assignment requiring lifting of heavy materials in excess of 0lbs; and/or overhead work in excess of 0 hours per day. Allow 10 minute break after each hour.

(Doc. 80-7 at 15–16); (Doc. 80-1 at 22:19–22). APRN Davis did not, however, change

Stockton's medical classification of "M-2." (Doc. 80-1 at 21:24–3). Per ADC Policy, an

M-2 medical classification indicates that an inmate is in "Good to Average physical

condition; can exert sustained effort over long periods and is physically capable of most

work assignments. Any disability present will not be jeopardized by such general

assignments." (Doc. 80-9 at 3).

    APRN Davis's Affidavit. In a related case, *Stockton v. Reed*, No. 4:24-CV-00840-

JM, ("*Stockton II*"),[4] the defendants submitted the affidavit of APRN Davis. *Stockton II*,

---

[3] A straight-leg raising test is used to detect pain related to degenerative disc disease. *See Pierce v. Kijakazi*, 22 F.4th 769, 772 (8th Cir. 2022); *Combs v. Kijakazi*, 69 F.4th 428, 431 (7th Cir. 2023).

[4] Because the two cases are closely related, the Court takes judicial notice of the record in *Stockton*

(Doc. 60-7). APRN Davis attested that the medical restrictions she assigned Stockton "did not prevent him from being assigned to a job that required crawling, stooping, running, jumping, walking, standing, strenuous physical activity, or overhead work. Rather, the restrictions prevented Mr. Stockton from being assigned to a job with those requirements without any breaks after 59 continuous minutes of work." *Stockton II*, (Doc. 60-7 at 3, ¶ 13). She went on to state that, at the time she assigned those restrictions, "[Stockton] was more than capable of sweeping, mopping, dusting, lifting a mop bucket for a short period of time, and other general cleaning tasks without severe pain or irritation of his medical condition." *Id.* at 4, ¶ 18. And she confirmed that "[a] barracks porter job assignment is not in conflict with the medical restrictions [she] gave Mr. Stockton on July 5, 2023." *Id.* at ¶ 19.

Job Assignment. Not long after receiving the work restrictions, Stockton was transferred to the ADC's Barbara Ester Unit ("Ester Unit"). (Doc. 80-4 at 24–25). On July 25, 2023, Jenkins called Stockton to her office for a job assignment. (Doc. 80-1 at 5:7–8, 19:14–18); (Doc. 80-2 at 1, ¶ 2). Stockton read the above work restrictions out loud to Jenkins; Jenkins did not review the restrictions independently. (Doc. 80-1 at 8:11–9:10). Despite Stockton's restrictions, Jenkins verbally assigned Stockton to be a barracks porter and told him she expected him to do the job. *Id.* Other than Stockton's verbal recitation of the restrictions, there is no indication that Jenkins had any further knowledge of Stockton's

---

*v. Reed*, No. 4:24-CV-00840-JM-JJV, ("*Stockton II*"). *United States v. Jackson*, 640 F.2d 614, 617 (8th Cir. 1981) (a district court can "take judicial notice, whether requested or not of its own records and files, and facts which are part of its public records. Judicial notice is particular[]ly applicable to the court's own records of prior litigation closely related to the case before it.") (cleaned up).

medical conditions—including APRN Davis's interpretation of those restrictions and Stockton's M-2 medical classification—when she made the verbal assignment.

That same day, Jenkins placed a request for review by the full Classification Committee. (Doc. 80-5 at 1). The seven Classification Committee members, including Jenkins and Deputy Warden Emmer Branch ("Deputy Warden Branch"), met on August 1, 2023, to consider Stockton's job assignment. (Doc. 80-5 at 3); (Doc. 80-3 at 2, ¶ 8). The Chief Deputy of the ADC, Marshall Reed ("Chief Deputy Reed"), avers that a representative from the ADC's third-party medical care provider, Wellpath, is always present at Classification Committee meetings "to make sure an inmate is not assigned to a job duty that would conflict with their medical restrictions." (Doc. 80-4 at 2–3, ¶¶ 12, 22–23). Though, as Chief Deputy Reed admits, there is no record that a Wellpath representative was present at the August 1, 2023 meeting. *Id.* at 3, ¶ 22; *see also* (Doc. 80-5 at 3). Regardless, the full Classification Committee unanimously affirmed Stockton's assignment as a barracks porter.[5] (Doc. 80-4 at 3, ¶ 24); (Doc. 80-5).

Job Duties. According to Jenkins, "duties of a barracks porter are to keep areas around the barracks clean. This includes sweeping floors, cleaning walls and windows, and making sure trash does not accumulate in common areas." (Doc. 80-2 at 2, ¶ 6). The current Deputy Warden of the Ester Unit, Kennie Bolden ("Deputy Warden Bolden"), confirms

---

[5] In *Stockton II*, Stockton claimed, *inter alia*, that Classification Committee member Deputy Warden Branch violated his constitutional rights by assigning him to the job of barracks porter on August 1, 2023. *Stockton II*, (Doc. 2 at 11). After considering Defendants' Motion for Summary Judgment on the merits, Stockton's job-assignment claim against Deputy Warden Branch was dismissed with prejudice based on a finding that Stockton's assignment as a barracks porter did not violate the restrictions imposed by APRN Davis. *Stockton II*, (Doc. 83 at 6); (Doc. 84).

that barracks porters are expected to keep their barracks clean, which "[i]n practice, []

consists of mopping or sweeping floors." (Doc. 80-3 at 2, ¶ 10). Deputy Warden Bolden

also explains that barracks porter is the least strenuous job assignment at the Ester Unit and

attests that:

> Barracks porters are not exposed to any prolonged periods of crawling, stooping, running, jumping, walking, or standing.
>
> Barracks porters do not have to lift heavy objects.
>
> Barracks porters do not have to perform any strenuous activity.

(Doc. 80-3 at 2, ¶¶ 11–13).

Stockton agrees that his job assignment required him to keep the barracks clean by

sweeping, mopping, cleaning walls, and picking up trash. *See* (Doc. 88 at 105). But he

claims that he cleaned windows, walls, and bars that were eight feet in height—requiring

him to do overhead work. *Id.* He also carried items that were over zero pounds, such as 24-

ounce spray bottles of cleaner, 25-gallon trash cans, brooms, mops, and buckets half-full

of water. (Doc. 80-1 at 9:13–23); (Doc. 88 at 105). He also points out that mopping and

sweeping required him to do a lot of pushing and pulling. (Doc. 80-1 at 10:7–8).

According to Deputy Warden Bolden, each barracks has a supervisor who "makes

sure inmates are performing their jobs and not misbehaving; however, they do not maintain

'exacting standards.'" (Doc. 80-3 at 2, ¶ 14). Stockton confirmed that there was no

supervision of his break time, (Doc. 80-1 at 10:23–24), and that his barracks supervisor

only came twice a week to make sure the barracks were clean. (Doc. 80-1 at 11:19–24).

Stockton also confirmed that he never got in trouble for failing to keep the barracks clean. *Id.* at 12:22–13:18.

Post-Assignment Medical Records. Stockton relies heavily on his medical records to show that his position as a barracks porter was detrimental to his health. *See* (Doc. 80-1 at 25:3–24); (Doc. 88 at 29–47). According to those records, Stockton placed a sick call request on August 1—the same day he was officially assigned to his position as a barracks porter. (Doc. 80-7 at 23). He complained that his job placement forced him to "utilize equipment which violated [his] restrictions" and claimed that his back was "out again" and "severely painful as a result." *Id.* He was seen by a nurse on August 2, who noted that Stockton's gait was steady and that he was already on prednisone and Tylenol. (Doc. 80-7 at 24). The nurse encouraged Stockton to continue taking his medication and to place another sick call if his symptoms continued or worsened. *Id.*

Stockton was seen again, on August 17, for complaints of severe back pain. (Doc. 80-7 at 23). Stockton stated that the pain was "due to having state[-]issued job against [his] medical restrictions." *Id.* The nurse made no notable observations about Stockton's physical condition but provided Stockton a three-day restriction for "No Duty" based on his complaints of pain. *Id.*

Stockton was again seen on August 24. (Doc. 80-7 at 22). Stockton complained of being housed in a barracks with stairs and that he was having severe back and leg pain from going up and down the stairs. *Id.* He requested a "no stairs script," which was not provided. *See id.* at 22, 103. But he was given another three-day restriction for "No Duty." *Id.*

On August 31, Stockton was examined by a doctor. (Doc. 80-7 at 14–15). The doctor noted that Stockton complained of "low back stiffness" and was "requesting conservative management." *Id.* at 14. But, upon examination, the doctor noted that Stockton's vital signs were stable, and he had a normal gait with negative straight-leg raise test bilaterally. *Id.* The doctor assessed Stockton as having "back pain exacerbation" and temporarily restarted Stockton on a muscle relaxer, counseled him to continue with self-rehabilitation and stretching, and encouraged him to stay active. *Id.* at 15.

Finally, Stockton presented to sick call on September 22, complaining that he injured his back "due to job bending and lifting requirements." (Doc. 80-7 at 21). He further claimed that his back was out, and he was in severe pain. *Id.* But, after the nurse observed that Stockton was alert and orientated and his breathing was even and unlabored, she simply instructed him that it was a matter he needed to take up with the ADC. *Id.*

## III.    DISCUSSION

In her Motion for Summary Judgment, Jenkins argues that she is entitled to qualified immunity in her individual capacity. (Doc. 80-10). Qualified immunity protects government officials from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Accordingly, Jenkins is entitled to qualified immunity in her individual capacity "unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Kelley v. Pruett*, 163 F.4th 1130, 1134 (8th Cir. 2026) (citation and

internal quotation marks omitted). Jenkins is entitled to qualified immunity should either prong be decided in her favor. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (citations omitted). The Court considers first whether Stockton was deprived of a constitutional right, as that issue is dispositive.

Stockton alleges that he was deprived of his Eighth Amendment right to be free from cruel and unusual punishment—a right which extends to conditions of confinement, including prison work assignments. *Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025) (citations omitted). To prevail on his Eighth Amendment conditions-of-confinement claim, Stockton must "prove both an objective element, which asks whether the deprivation was sufficiently serious, and a subjective element, which asks whether the defendant officials acted with…deliberate indifference." *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993). Because Stockton has not demonstrated that his job assignment posed a substantial risk of serious harm or that Jenkins acted with deliberate indifference, Jenkins is entitled to summary judgment.

### A.    Substantial Risk of Serious Harm

For the objective prong, Stockton must demonstrate that he was "incarcerated under conditions posing a substantial risk of serious harm." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017). (cleaned up). Stockton argues that his job as a barracks porter constituted a substantial risk of serious harm because it exceeded the medical restrictions given to him by APRN Davis. (Doc. 89 at 4–8).

But Stockton's argument appears to be based on a misunderstanding of his restrictions against *prolonged* crawling, stooping, running, jumping, walking, and

standing; *strenuous* physical activity; and *heavy* lifting and overhead work. (Doc. 80-7 at 15–16). In his affidavit, Deputy Warden Bolden asserts that the position of barracks porter does not require most of these things (his affidavit is silent on whether the job requires overhead work). (Doc. 80-3 at 2, ¶¶ 11–13). And, as APRN Davis swore, the job duties of a barracks porter did not conflict with the medical restrictions she assigned Stockton, and Stockton was "more than capable" of performing those duties for short periods of time without severe pain or irritating his medical condition. *Stockton II*, (Doc. 60-7).

Although Stockton states that he performed overhead work and lifted potentially heavy objects, such as bottles of cleaner, trash cans, and buckets of water, there is nothing in the record indicating that he was compelled to do these things. As Stockton confirmed, there was little supervision of his job performance; he was able to take breaks whenever he needed; and he never received any reprimand for failing to clean his barracks adequately. (Doc. 80-1 at 10:11–11:24, 12:22–13:1). Given the lack of close supervision or rigorous standards, one assumes that Stockton could find ways to complete his cleaning duties without violating his work restrictions or otherwise aggravating his medical condition.

Setting aside Stockton's misunderstanding of the somewhat ambiguous medical restrictions, there is no evidence to show that Stockton's duties as a barracks porter, objectively, posed a substantial risk of serious harm to him. *Kulkay*, 847 F.3d at 642. There is no dispute that Stockton has a long-documented history of back pain, supported by objective findings of degenerative disk disease. (Doc. 80-7 at 15, 20). But, what the records *do not* show is an objective exacerbation of that pain caused by his work as a barracks porter.

Stockton began his medical complaints the same day he was assigned to be a barracks porter. (Doc. 80-7 at 23). But, despite Stockton's subjective complaints of a new injury and that his "back was out again," the nurse made no objective findings of a new injury. *See id.* at 24 (noting only that Stockton was awake and alert, had no shortness of breath or trouble breathing, his gait was steady, and he was complaining of lower back pain from an old injury). Although Stockton continued to submit medical requests and complain of pain, the lack of objective findings also continued. *See* (Doc. 80-7 at 14–15, 21–23). Moreover, the records show that Stockton: attributed at least some of his pain to walking up and down stairs (an issue separate from his job assignment), (Doc. 80-7 at 22); had a negative straight-leg raise (an improvement from his positive test prior to the job assignment), (Doc. 80-7 at 14–15); and was even encouraged by the doctor to stretch and stay active, (Doc. 80-7 at 15).

In short, there is simply no evidence that Stockton's job as a barracks porter—which required him to clean the barracks at his own pace with little supervision and frequent breaks—objectively, constituted a substantial risk of serious harm to his health or safety.

### B.    Deliberate Indifference

Even assuming there was a risk to Stockton's health, there is no evidence that Jenkins was deliberately indifferent to that risk. "[T]he deliberate-indifference standard is difficult to meet. It requires a highly culpable state of mind approaching actual intent to harm the inmate." *Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025). Thus, "in the prison work assignment context, prison officials are deliberately indifferent when they *knowingly* compel an inmate to perform labor that is beyond the inmate's strength,

dangerous to his or her life or health, or unduly painful." *Kulkay*, 847 F.3d at 643 (cleaned up; emphasis added).

Viewing the evidence in a light most favorable to Stockton, Jenkins knew that Stockton had the medical restrictions imposed by APRN Davis. But, even so, there is no evidence showing that Jenkins was aware that the job would be dangerous or unduly painful for Stockton.

Instead, the evidence shows the following regarding Jenkins's mental state when she verbally assigned Stockton to the barracks-porter position. She knew that the job involved sweeping, cleaning walls and windows, and picking up trash. (Doc. 80-2 at 2, ¶ 6). She believed the job did not involve any prolonged periods of strenuous activity or heavy lifting. *Id.* at ¶ 7. She knew that the job would have to be approved by the full Classification Committee. (Doc. 80-5 at 1); *see also* (Doc. 80-2 at 1, ¶¶ 2–3). And she could reasonably believe, based on the ADC's usual practice, that a medical representative would be present at the Classification Committee's meeting to ensure Stockton was not assigned to a job that would conflict with his medical restrictions. (Doc.80-4 at 2–3, ¶¶ 22–23). Based on this evidence, no jury could reasonably conclude that, with a highly culpable state of mind, Jenkins knowingly compelled Stockton to perform a job that was beyond his strength, dangerous to his life or health, or unduly painful. *Joseph*, 144 F.4th at 1113; *Kulkay*, 847 F.3d at 643.

Because Stockton has not demonstrated that the barracks-porter position constituted a substantial risk of harm to his health or that Jenkins was deliberately indifferent to any such risk, Jenkins is entitled to qualified immunity and judgment as a matter of law.

## IV.    CONCLUSION

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendant's Motion for Summary Judgment, (Doc. 80), be GRANTED.

2.    Judgment be entered for Jenkins on Stockton's job-assignment deliberate-indifference claim against her.

3.    The Clerk be directed to close this case.

DATED this 25th day of February, 2026.


_____
UNITED STATES MAGISTRATE JUDGE